UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
                                                         :

UNITED STATES OF AMERICA         :

          - v -                            :          21 Cr. 268 (LTS)

YENNY SANTOS-REYNOSO,          :

                  Defendant.     :
------------------------------------------------------ x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT BECAUSE 8 U.S.C. § 1326 VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT, AND BECAUSE THE IMMIGRATION JUDGE WHO PURPORTED TO ORDER MS. SANTOS-REYNOSO'S REMOVAL *IN ABSENTIA* LACKED JURISDICTION TO DO SO**

                                                             DAVID PATTON, ESQ.
                                                              Federal Defenders of New York, Inc.
                                                              Attorney for Defendant
                                                              YENNY SANTOS-REYNOSO
                                                              52 Duane Street - 10th Floor
                                                              New York, New York 10007
                                                              Tel.: (212) 417-8737

                                                              MARTIN S. COHEN
                                                              *Of Counsel*

TO:    DAMIAN WILLIAMS, ESQ.
          United States Attorney
          Southern District of New York
          One. St. Andrew's Plaza
          New York, New York 10007
          Attn:   KEVIN MEAD, ESQ.
                    Assistant United States Attorney

**PRELIMINARY STATEMENT**

Defendant Yenny Santos-Reynoso respectfully submits this reply memorandum in support of her motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12 because the illegal reentry offense with which he is charged, 8 U.S.C. § 1326, violates the equal protection guarantee of the Fifth Amendment.

The government, to its credit, does not dispute that the Undesirable Aliens Act of 1929 – which included the illegal reentry provision later codified at 8 U.S.C. § 1326 – was enacted with explicit racial animus against Latinos. And it does not argue against the overwhelming evidence that 8 U.S.C. § 1326 has also had a disparate impact on Latinos since its inception.

Instead, it argues that the Court should disregard the law's racist history and disparate impact because the illegal reentry provision of the Undesirable Aliens Act of 1929 was "officially reenacted as a felony offense in 1952 as part of the broader Immigration and Naturalization Act." Gov't Mem. in Opp. ("Gov't Br."), ECF Dkt. No. 22, at 3. According to the government, the racial animus that motivated the 1929 Act had disappeared when Congress reenacted the virtually identical provision in 1952, and – the government argues – the fact that Congress did not acknowledge or address the racism reflected in the 1929 Act when reenacting the statute in 1952 is irrelevant.

There are fatal problems with both prongs of this argument. First, racial animus continued to be an explicit motivating factor in the recodification of the illegal reentry provision in the 1952 Act, as summarized at pages 10-13 of Defendant's brief, and extensively supported by the affidavit of Professor S. Deborah Kang. (Ex. B.) Instead of attempting to rebut the showing that the reenactment in 1952 was tainted with racial animus as a factual matter, the government simply pretends that Ms. Santos-Reynoso made no such argument.

Second, the government's assertion that Congressional silence when reenacting a statute permeated by racial animus has no bearing on the analysis of whether the subsequent statute is also tainted by racism is directly contradicted by two recent Supreme Court cases, *Ramos v. Louisiana*, 140 S. Ct 1390 (2020) and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). *See* Def't Br. at 1-2. As Justice Alito wrote: because "*Ramos* is now precedent," it emphatically does not matter whether [the legislature] readopted [a discriminatory] provision for benign reasons. The provision's uncomfortable past must still be examined . . . [to ensure] that the animus was scrubbed." *Espinoza*, 140 S. Cr. at 2273 (Alito, J., concurring) (internal quotations and alterations omitted).The government offers pre-*Ramos,* pre-*Espinoza* lower-court authority, but does not cite, let alone engage with, either case.

Here, Ms. Santos-Reynoso has met her burden of demonstrating that a discriminatory purpose was a motivating factor when Congress first created the crime of illegal reentry in 1929, and when it reenacted the statute in 1952. Ms. Santos-Reynoso has further demonstrated that the statute disparately impacted Latinos. Under *Arlington Heights*, the burden shifts to the government to show that Congress would have passed the illegal reentry provision in 1929 and 1952 "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68, 270 n.21. The Government has provided no such evidence, and accordingly the Court should dismiss the indictment.

## DISCUSSION

**I.    Ms. Santos-Reynoso Has Made the Requisite Showing of Discriminatory Intent and Disparate Impact Under *Arlington Heights***

Under the burden-shifting framework set forth in *Arlington Heights*, the party alleging an equal protection violation must show that a law was created with a "discriminatory intent or purpose" and has a "racially disproportionate impact."  429 U.S. at 265.  Ms. Santos-Reynoso

2

has made both showings. (Def't Br. 7–13). As to discriminatory intent, the government does not meaningfully gainsay the evidence of intent provided by Ms. Santos-Reynoso. (Def't Br. 7-13; Affidavits of Professors Eric S. Fish and Dr S. Deborah Kang). Instead, it argues incorrectly that the subsequent reenactment of the reentry statute in 1952 purged it of its invidious intent. (Gov't Br. at 3). As to disproportionate impact, the Government is silent in the face of the overwhelming evidence that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266.

### A. The Government has not rebutted the showing of racist intent in the 1929 illegal-reentry statute and its reenactment in 1952.

"Because discriminatory intent is rarely susceptible to direct proof, a district court . . . must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 266). Because legislatures are rarely motivated solely by a single concern, a law's challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Rather, the challenger must show only "that a discriminatory purpose has been *a motivating factor* in the decision." *Id.* (emphasis added). A statute's discriminatory intent will remain a motivating factor until a subsequent legislature consciously confronts and disclaims it. *See Espinoza*, 140 S. Cr. at 2273 (Alito, J., concurring) (a provisions "uncomfortable past" must still be examined to make clear that the "animus was scrubbed.").

It is a hornbook principle of both statutory construction and equal protection doctrine that a law's "history and purpose," including the history of predecessor statutes, is relevant to interpreting the law today. *See, e.g.*, *Wooden v. United States*, 1423 S. Ct. 1063, 1072-74 (2022) (in interpreting the Armed Career Criminal Act, looking to "statutory history and purpose,"

3

including the language of the statute "[f]or the first four years of its existence" to understand the significance of later amendments); *Arlington Heights*, 429 U.S. at 267-68 (requiring consideration of a decisions "historical background"). It follows that the legislative history of the original law will remain relevant to analyzing a reenactment unless the original law's discriminatory purpose is explicitly confronted and rejected.

It is hard to imagine a more explicit and developed record of racial animus leading up a law's enactment than the one presented by Professors Fish and Kang. (Exs. A, B). Indeed, the government concedes that Ms. Santos-Reynoso "may be able to show that [the Undesirable Aliens Act of 1929] was enacted with a discriminatory purpose." (Gov't Br. at 3.) The government then simply ignores the evidence of racial animus in connection with the 1952 reenactment, and does not engage or address Dr. Kang's opinion that the 1952 Act was itself motivated by a desire to concretize "a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers."  (Ex. B at 17; *see id.* at 14–21 (examining history of the 1952 McCarran-Walter Act)).

The government suggests that the 1952 reenactment was in some way substantively different from the 1929 law and that it was subject to "significant debate." (Gov't Br. at 3). Neither of these assertions are accurate. The McCarran-Walter Act "brought together in a single omnibus bill all of the disparate immigration and naturalization provisions that were [previously] scattered throughout the U.S. Code." *See* Eric S. Fish, *Race, History and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1103-05 (2022) (citing Marion T. Bennett, *The Immigration and Nationality (McCarren-Walter*) Act of 1952, as Amended to 1965*, 367 Annals Am. Acad. Pol. & Soc. Sci.* 127, 127 (1966)). More than 200 enactments in some way related to immigration were brought together in the bill. *Id.* A significant portion of this undertaking was ministerial, as "[t]he

resulting law largely preserved existing immigration policies, reorganizing and recodifying them into a modern legislative code." *Id.* at 1098-99.

In addition to moving the felony statute at issue here to 8 U.S.C. § 1326, the McCarren-Walter Act made one change to the text: "it added a new 'found in' element to the felony, so that a defendant could now be convicted if he or she 'enters, attempts to enter, or is at any time found in, the United States." *Id.* at 1099 (quoting 8 U.S.C. § 1326 (2018)). In a letter from Deputy Attorney General Peyton Ford to Senator McCarran proposing the new element, Peyton used a racially derogatory term to explain that "statutory clarification on the above points will aid in taking action against the conveyors and receivers of *the wetback*." *Id.* at 1099 n.401 (emphasis added). This technical fix to cure a jurisdictional problem (albeit one that made the statute significantly easier to prosecute) was the *only modification* to Section 1326 by the 1952 Congress.

A comprehensive review and analysis of the 925-page Senate report concerning the McCarran-Walter Act reveals "almost no discussion" of Sections 1325 (the misdemeanor unauthorized reentry provision) or Section 1326 (the felony reentry provision at issue here). *Fish*, supra, at 1099. Based on a record indicating scant engagement with the law in question, and certainly no engagement with the 1929 Congress's motivations, "it is clear from this record that Congress in 1952 did not debate the merits of these crimes. . . . This was a recodification project. . . . Congress did not understand itself to be creating new law. It was keeping the existing law in place, with some technical modifications, and changing its code section." *Id.* at 1100.

1. **The 1952 Reenactment does not purge the illegal reentry statute's discriminatory taint.**

Without examining the legislative history surrounding the 1952 Act, the government argues that the Court must ignore the explicit racism that permeated the legislative history of the

predecessor statute, and that despite the fact that Congress neither acknowledged nor addressed that history, assume that Congressional silence represents its repudiation.

The Supreme Court, however, has rejected the idea that reenacting a law originally passed with a discriminatory purpose cleanses it of the original invidious purpose. (Def. Br. 1-2 (discussing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020)). The unexamined reenactment of Section 1326 by the 1952 Congress does not justify ignoring the 1929 Congress's motivations. It is clear that the 1952 Act did not "actually confront" [the illegal reentry statute's] tawdry past." *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring). The legislative history of the 1952 law does not include any statement of Congress's purpose in reenacting Section 1326, thus providing no basis to ascertain any race-neutral reason for the reenactment. And it certainly does not acknowledge, let alone engage with Section 1326's history. The sparse legislative record shows the 1952 Congress left this provision's "uncomfortable past unexamined," *Ramos*, 140 S. Ct. at 1401 n. 44, and falls well short of demonstrating that, as a result of the 1952 Act, Section 1326 became "untethered to racial bias," even if, for the sake of argument, Congress reenacted it for race neutral reasons. *Id.* at 1410 (Sotomayor, J., concurring); *accord Espinoza*, 140 S. Ct. at 2273 (Alito, J. concurring (Under *Ramos*, "it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons.").

To use Justice Alito's words, it is far from clear that "the animus was scrubbed" when Congress passed the 1952 law. *Espinoza*, 140 S. Ct. at 2273 (Alito J., concurring). If anything, the scant record which exists confirms only that Congress made it *easier* to prosecute violations of Section 1326 by adding the "found in" provision, which Deputy Attorney General Ford had requested in order to facilitate the prosecution of "the wetback." Fish, *supra*, at 1099 n.401.

6

After 1952, 8 U.S.C. § 1326 was amended several times, primarily to strengthen the penalties associated with the offense. Even assuming these later reenactments of § 1326 *could* theoretically cleanse the statute of its racist intent, the government has not explained how the post-1952 enactments *strengthening* its penalties without any reexamination of its problematic origins would do so.

Congress did nothing in 1952 that would justify ignoring the discriminatory purpose that led to the enactment of the illegal reentry provision in 1929, which was left substantively intact in 1952. Applying *Arlington Heights*, the discriminatory animus from 1929 continued to infect the 1952 law, and the burden shifts to the government to prove that the law would have passed even without a discriminatory purpose. The government has not even attempted to make such a showing, and accordingly, the Court should find that the illegal reentry provision of 8 U.S.C. § 1326 violates the equal protection guarantee of the Fifth Amendment, and the indictment should be dismissed.

## CONCLUSION

For the foregoing reasons and those advanced in Ms. Santos-Reynoso's opening brief, the Court should dismiss the indictment or, in the alternative, hold a hearing on the motion.

Dated: New York, NY
       June 1, 2022

Federal Defenders of New York, Inc.
<u>By: /s/ Martin Cohen</u>
Martin Cohen
Assistant Federal Defender
Federal Defenders of NY, Inc.
52 Duane St. 10th Fl.
New York, NY 10007

*Attorneys for Defendant*

TO:   Damian Williams, Esq.
       United States Attorney
       Southern District of New York
           *Att'n:* Kevin Mead, Esq.