```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
UNITED STATES OF AMERICA,                                          :
                                                                   :
             -v-                                                   :     21-CR-268-LTS
                                                                   :
YENNY SANTOS-REYNOSO,                                              :
                                                                   :
                          Defendant.                               :
                                                                   :
-------------------------------------------------------------------X
```

## MEMORANDUM ORDER

Defendant Yenny Santos-Reynoso ("Defendant" or "Ms. Santos-Reynoso") brings this motion to dismiss the indictment. (Docket entry no. 29.) The Court has carefully considered the submissions of the parties, including Defendant's memorandum of law (docket entry no. 30) accompanied by the Declaration of Martin Cohen in support of the Motion and annexed documents (docket entry no. 31 ("Cohen Decl.")), the Government's opposition dated May 1, 2022, (docket entry no. 32 ("Opp.")) and subsequent letter dated June 22, 2022 (docket entry no. 37), and Defendant's reply dated June 1, 2022 (docket entry no. 34 ("Reply")). For the following reasons, Defendant's motion is denied in its entirety.

## BACKGROUND

The Indictment in this case charges Ms. Santos-Reynoso with one count of illegal reentry in violation of 8 U.S.C. section 1326 ("Section 1326"). (Docket entry no. 8 (the "Indictment").) Ms. Santos-Reynoso was born in the Dominican Republic in 1980 and remains a citizen of the Dominican Republic. (See Cohen Decl ¶ 3; Opp. at 1.) At some point, she unlawfully entered the United States. On July 10, 2008, Defendant U.S. Immigration and Customs Enforcement ("ICE") issued a Notice to Appear ("NTA"), ordering Defendant "to

appear before an Immigration Judge of the United States Department of Justice" on a date and time to be set at a later date to show cause as to why she should not be removed from the United States. (Cohen Decl., Ex. D; Opp. at 1.) On April 6, 2009, a Notice of Hearing in Removal Proceedings was issued, informing Defendant that her appearance was scheduled for June 22, 2009, at 1:00 p.m. at 26 Federal Plaza in New York, New York. (Cohen Decl., Ex. E; Opp. at 1.) Ms. Santos-Reynoso failed to appear at the hearing, which was conducted in absentia, and Immigration Judge Mary M. Cheng ordered Defendant's removal to the Dominican Republic. (Cohen Decl., Ex. F.)

In 2010, Ms. Santos-Reynoso was convicted in the New York County Criminal Court of criminal possession of a controlled substance in the third degree in violation of New York Penal Law section 220.16(1). (Cohen Decl. ¶ 3; Opp. at 1-2.) She was subsequently removed to the Dominican Republic on September 29, 2010. (Opp. at 2.)

Ms. Santos-Reynoso re-entered the United States after her removal. On January 13, 2021, Magistrate Judge Wang authorized a complaint charging the Defendant with illegal reentry, after having been removed subsequent to a felony conviction and without obtaining the express consent of the Attorney General or the Secretary for the Department of Homeland Security, in violation of 8 U.S.C. section 1326. Ms. Santos-Reynoso was arrested on February 16, 2021. (Docket entry no. 1.) Defendant has been released on bail since her arrest. (Docket entry no. 5.)

Ms. Santos-Reynoso makes two arguments in support of her motion to dismiss the indictment. First, Defendant argues that the statute under which she is charged – 8 U.S.C. section 1326 – violates the equal protection guarantee of the Fifth Amendment under the standard articulated in Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429

U.S. 252 (1977). (Docket entry no. 30 ("Mem.") at 1.) Second, Defendant argues that the immigration judge who ordered her removal in June 2009 lacked jurisdiction to do so because the July 10, 2008, NTA failed to specify the requisite information about the upcoming hearing. (Id.) Ms. Santos-Reynoso acknowledges that the second argument is precluded under the current law of the Second Circuit. (Id.)

## DISCUSSION

Equal Protection Challenge

18 U.S.C. section 1326 makes it illegal for a noncitizen, who has previously been removed from the United States subsequent to a conviction for the commission of a felony, to re-enter the country without proper authorization. Ms. Santos-Reynoso's challenge to 18 U.S.C. section 1326 is one of "many similar challenges defendants have filed across the United States" following the decision by a court in the District of Nevada in United States v. Carrillo-Lopez, 555 F. Supp. 3d 996 (D. Nev. 2021). United States v. Porras, No. 21-CR-158, 2022 WL 1444311, at *1 (N.D. Ill. May 6, 2022).

In United States v. Carrillo-Lopez, the District Court granted the defendant's motion to dismiss an indictment charging him with illegal reentry, concluding that the defendant had shown that Section 1326 was enacted with a discriminatory purpose, had a disparate impact on Latinx persons, and violated the Fifth Amendment's guarantee of equal protection under the law. Ms. Santos-Reynoso makes the same argument in her motion. Since the Carrillo-Lopez decision was issued, it has been widely criticized, and district courts across the United States, including two courts sitting in this District, have found the Carrillo-Lopez decision to be an "outlier" and upheld Section 1326 as constitutional. United States v. Suquilanda, No. 21-CR-263-VM, 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021) (finding "there are no equal

protection issues here" as the Court was "not persuaded [movant], or any other criminal defendant in the many cases rejecting such arguments, has carried [their] burden of showing Section 1326 was enacted, or later modified, with discriminatory intent"); see also United States v. Crespo-Castelan, No. 22-CR-009-JFK, 2022 WL 2237574, at *1 (S.D.N.Y. June 22, 2022) ("agree[ing] with the Government and conclud[ing] that [Defendant] . . . failed to allege an equal protection claim" with respect to Section 1326); United States v. Viveros-Chavez, No. 21-CR-665, 2022 WL 2116598, at *1, 8-9 (N.D. Ill. June 13, 2022) (noting "[e]very court to decide this issue has rejected the constitutional challenge, except for one court in the District of Nevada"). Indeed, on June 13, 2022, a district court in the District of Nevada issued a decision disagreeing with the Carrillo-Lopez opinion and "follow[ing] the reasoning of the majority of courts" who have determined that insufficient evidence was proffered to find that Section 1326 was enacted with racial animus as a motivating factor. United States v. Alfredo Salas-Silva, No. 20-CR-54-RCJ-CLB, 2022 WL 2119098, at *3-4 (D. Nev. June 13, 2022).

"A facially neutral statute can violate equal protection principles if it both has a racially disparate impact and the legislative body was motivated to enact the statute at least in part by racism." United States v. Rodriguez-Arevalo, No. 19-CR-281, 2022 WL 1542151, at *3 (M.D. Pa. May 16, 2022) (quoting Arlington Heights, 429 U.S. at 265-66); United States v. Ponce-Galvan, No. 21-CR-02227-H-1, 2022 WL 484990, at *2 (S.D. Cal. Feb. 16, 2022) (explaining Plaintiff need only show racial discrimination "was at least a 'motivating factor'" for the legislation at issue) (citation omitted). The Government does not contest Defendant's argument that Section 1326 has disparately impacted Hispanic peoples, but rather submits that Defendant has failed to show that Congress was motivated to enact Section 1326 based on racial animus. (Opp. at 2.) In order to determine "whether invidious discriminatory purpose was a

motivating factor" for the enactment of Section 1326, Courts conduct a "sensitive inquiry" into a variety of factors including the "impact of the official action" and whether it "bears more heavily on one race than another"; the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence"; and the "legislative or administrative history". Arlington Heights, 429 U.S. at 266-68.

In support of her motion, Ms. Santos-Reynoso focuses heavily on the historical background and legislative history of the Undesirable Aliens Act of 1929 ("UAA"), which she submits served as the precursor of the unlawful reentry provision codified in the 1952 Immigration and Nationality Act ("INA"). (Mem. at 8-11.) Defendant relies on a declaration from Professor Eric Fish, who describes the historical context leading up to the passage of the UAA, including the "complementary strategy" of exempting Hispanic immigrants from immigration quota systems in order to guarantee Western agricultural interests access to a "cheap, exploitable" labor source, while expelling the Hispanic immigrants already present in the United States. (Mem. at 8-9; Cohen Decl., Ex. A.) Professor Fish explains that the "congressmen debating the [UAA] focused overwhelmingly on the issue of Mexican immigration" (id. at 15), and the illegal reentry provision of the UAA "represented a compromise between the nativists" seeking to exclude Hispanic immigrants and the "agricultural industry" seeking to ensure its "continued use of exploitable laborers from Mexico" by way of "punish[ing] and deport[ing] laborers once their work was done." (Mem. at 10 (citing Cohen Decl., Ex. A at 12-16).)

Ms. Santos-Reynoso submits that Congress essentially "recodified the illegal reentry provision of the [UAA]" as Section 1326 of the INA in 1952. She argues that, because

Congress "never 'grappled with the [UAA's] sordid history' in order to free it from its discriminatory taint" when it reenacted the unlawful reentry statute in 1952, Section 1326 "remains tethered to the racial animus that permeated" the UAA. (Mem. at 2-3 (citation omitted).) Indeed, because the "taint" of the UAA's discriminatory purpose "has never been lifted," Defendant argues, Section 1326 is presumptively unconstitutional and "[t]he burden . . . shifts to the Government to show that Congress would have nevertheless passed the 1929 law and reenacted it in 1952 absent any discriminatory purpose, and that the provision has been freed of its discriminatory taint." (Id. at 3-4.) In support of her argument, Defendant relies on the decisions rendered in Ramos v. Louisiana, 140 S. Ct. 1390 (2020), and Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246 (2020) for the proposition that a law's historical origins are "crucial to the constitutional analysis." (Mem. at 2-3.)

Under the Arlington Heights framework, the historical context of a legislative enactment is one relevant factor for courts to consider in evaluating whether racial animus was a motivating factor in the legislation's passage. See United States v. Wence, No. 20-CR-0027, 2021 WL 2463567, at *5-6 (D.V.I. June 16, 2021). The Supreme Court's decisions in Ramos and Espinoza, although rendered outside the context of an equal protection challenge, confirm this very point and "support the contention that subsequent enactments of a statute do not erase its historical context." United States v. Rios-Montano, No. 19-CR-2123-GPC, 2020 WL 7226441, at *4 (S.D. Cal. Dec. 8, 2020) (describing impact of the decisions); see also United States v. Hernandez-Lopez, No. H-21-440, 2022 WL 313774, at *6 (S.D. Tex. Feb. 2, 2022) ("In both cases, the Court acknowledged that the laws had a discriminatory history, and this inquiry is included in the Arlington Heights framework."). Courts examining the "enduring taint theory" proffered by Defendant here, however, have cautioned that the discriminatory motives

underlying the passage of a previous statute, while relevant, are not "determinative of the outcome of an Arlington Heights analysis of a law enacted by a subsequent legislature." Hernandez-Lopez, 2022 WL 313774, at *6; see also Rodriguez-Arevalo, 2022 WL 1542151, at *5 (same); Viveros-Chavez, 2022 WL 2116598, at *6 (explaining relevance of prior Congress' intent to passage of subsequent legislation). Rather, Arlington Heights "directs the Court to look at the motivation behind the official action being challenged,' which is not the 1929 Act" in this case, "but rather [section] 1326 from the 1952 INA." United States v. Sanchez-Felix, No. 21-CR-310, 2021 WL 6125407, at *5 (D. Colo. Dec. 28, 2021); Crespo-Castelan, 2022 WL 2237574 at *3 ("Evidence of prior discriminatory intent, however, cannot satisfy [Defendant's] burden of establishing that [section] 1326 was enacted, or later modified, with a discriminatory purpose.").

To the extent Defendant argues that it is the Government's burden to demonstrate that "Congress has . . . attempted to cleanse" Section 1326 of its racist origins (Mem. at 3), Defendant misapplies the operative legal standard. The Supreme Court has explained that "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination[,]" and "[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." Abbott v. Perez, 138 S. Ct. 2305, 2324-25 (2018); see also United States v. Ramirez-Aleman, No. 21-CR-3403-BEN, 2022 WL 1271139, at *6 (S.D. Cal. Apr. 27, 2022) ("Defendant in this case asks this Court to commit the same error [as the district court in Abbot] by demanding Congress prove it has faced the (alleged) discriminatory roots of the 1929 Act and changed its heart in more recent enactments and amendments, thereby purging the taint."). Thus, the Court

will examine whether Defendant has met her burden to show that Section 1326 is unconstitutional.

The UAA does have a "dark history," and "at least some members of Congress were motivated to criminalize reentry because of their support for eugenics and opposition to the increased presence of the 'Mexican race' in the United States." Hernandez-Lopez, 2022 WL 313774, at *3. The Court finds, however, that the discriminatory motivations behind the enactment of this earlier statute, while relevant, are of limited probative value to the evaluation of the constitutionality of Section 1326. Twenty-three years passed between the passage of the UAA and the INA, and "only thirty congressmen from the [1929] Congress remained in office in 1952." See Viveros-Chavez, 2022 WL 2116598, at *8; Sanchez-Felix, 2021 WL 6125407, at *6 (finding the "views of congressional members in 1929 [to be of] less probative value in determining the views of members of Congress in 1952, who passed [section] 1326"). Therefore, the historical context leading to the passage of the UAA is quite "remote" from the factors leading to the enactment of the INA. Hernandez-Lopez, 2022 WL 313774, at *5 (finding history of UAA to be "remote from the 1952 Congress" and thus its probative value "limited"). Moreover, although both statutes criminalized unlawful reentry, there are "key substantive differences" between the two statutes "that establish that section 1326 is not a mere reenactment of the UAA." Viveros-Chavez, 2022 WL 2116598, at *5 (explaining the expanded factual predicates triggering Section 1326 and other linguistic differences). For example, Section 1326 permits noncitizens to avoid prosecution by obtaining advanced authorization for their reentry by the Attorney General, while the UAA contained no such provision and, in contrast, was "absolute in barring reentry." Id.

Thus, although the UAA provides some helpful context to the historical background of the unlawful reentry statutes, it does not establish "the motivation behind the official action being challenged" – namely Section 1326 of the 1952 INA.  Ponce-Galvan, 2022 WL 484990, at *3; United States v. Muria-Palacios, No. 21-CR-23-JAM, 2022 WL 956275, at *2 (E.D. Cal. Mar. 30, 2022) (explaining the Court must focus on the "official action being challenged[,]" namely "Section 1326 . . . not the repealed 1929 Act") (emphasis in original); Suquilanda, 2021 WL 4895956, at *5 (explaining that the UAA "was undoubtedly enacted in the face of bald racial animus . . . . [b]ut this evidence bears little weight on section 1326"); United States v. Sifuentes-Felix, No. 21-CR-337-WJM, 2022 WL 293228, at *2 (D. Colo. Feb. 1. 2022) (same).

Ms. Santos-Reynoso argues that racial animus against Hispanics "continued to be a motivating factor" behind the passage of the INA, which is also known as the McCarran-Walter Act of 1952.  (Mem. at 11-14.)  Defendant submits and relies heavily in this connection on the declaration of Professor Deborah Kang (Cohen Decl., Ex. B) to "trace[] the anti-Mexican racism that undergirded U.S. immigration policy" between the UAA and the passage of the INA in 1952 including the "disparate prosecutions of Mexicans under the Undesirables Act; the forced repatriation of nearly 500,000 undocumented Mexicans; and the Bracero Program, created purportedly to provide Mexican workers with better working conditions, but in fact riven by abuse and discrimination."  (Mem. at 11.)  Defendant also submits that Congress' consideration of the so-called "Wetback Bill," which would "criminaliz[e] the harboring of non-citizens," contemporaneously with its consideration of the INA, demonstrates Congress' racial animus toward Hispanic peoples.  (Id. at 13.)

Defendant also relies on statements made by legislators and other government officials serving at the time of the INA's passage in support of her motion. For example, in her declaration, Professor Kang points to statements made by Senator Pat McCarran, who co-authored the INA, in which he "referred to both legal and undocumented Mexicans as 'wetbacks'" during appropriations hearings in 1951 and 1952; a statement from Senator Allen Ellender "complain[ing] about the strictures imposed by the Bracero Program," around the same time period; and statements from representatives made during discussions about whether to eliminate the "national origins quota system" from the INA. (Cohen Decl., Ex. B at 17-20.) Ms. Santos-Reynoso further relies on Congress' decision to enact the INA over the veto of President Harry Truman, "who explicitly called out the law for its racism," and a letter from Attorney General Ford explaining his views on the proposed legislation and incorporating the racial slur, "wetback," in support of his position.

These proffers are relevant to the extent they further elucidate the historical context in which Section 1326 was enacted. As previously explained, however, historical background is only one factor of the Arlington Heights standard, and Defendant fails to provide any direct evidence linking racial animus against Hispanic peoples to the enactment of Section 1326 of the INA. See Crespo-Castelan, 2022 WL 2237574 at *3 (finding President Truman's veto statement, the Ford memo, and "racist remarks made by various members of Congress" "fail[] to establish that racial animus was a motivating factor behind the reenactment of [Section] 1326"). Although the statements made by a handful of legislators around the time period of the INA's passage are deeply disturbing, the Court recognizes that these statements were not made about Section 1326 specifically, and "cannot be used to ascribe intent to the other hundreds of members of Congress." Viveros-Chavez, 2022 WL 2116598, at *8. Nor does the Court find the

statements made by President Truman or Attorney General Ford to be particularly probative, as they were not members of Congress who voted on the INA, and thus their views provide "no direct insight into the motivations of the 1952 Congress [who] passed the law." Salas-Silva, 2022 WL 2119098, at *3 (citation omitted).  Moreover, not only have courts "cautioned that statements by a bill's opponents are not probative of Congress's motives," and thus President Truman's veto statement is of limited probative value, but the veto statement was not specifically about Section 1326 or the bill's "treatment of immigrants from Latin America" but, rather, concerned the "INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe." Id.; see also Viveros-Chavez, 2022 WL 2116598, at *8 (explaining that "President Truman did not mention section 1326 in the veto statement, nor did he say anything about the INA arising from a desire to target Latinos or Mexicans").

Professor Kang admits that "Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act." (Cohen Decl., Ex. B. at 21.)  Given the Court's obligation to presume Congress acted in good faith, and Defendant's failure to tie particular evidence to the specific motivations underlying Section 1326, the Court finds Congress' silence on the issue of racial discrimination to be insufficient for Plaintiff to meet her burden.  See Salas-Silva, 2022 WL 2119098, at *3 (citing Abbott, 138 S. Ct. at 2324).

Furthermore, the Court recognizes that Congress has amended Section 1326 several times since its original enactment in 1952 in order to "increase [Section 1326's] deterrent value[,]" Salas-Silva, 2022 WL 2119098, at *4, and "with nary a word suggesting discriminatory animus to those of Latin American descent." United States v. Calvillo-Diaz, No. 21-CR-445, 2022 WL 1607525, at *11 (N.D. Ill. May 20, 2022).  Professor Kang submits that

"during the 1988, 1990, 1994, and 1996 legislative debates," about the amendments, "lawmakers made no effort to acknowledge and/or amend the racial animus that informed earlier iterations of this provision."  (Cohen Decl. Ex. B at 34.)  For the reasons already stated, the Court declines to adopt the viewpoints that Congressional silence is automatically indicative of discriminatory intent, and that the statute at issue was fatally infused with racial animus from the passage of the UAA.  Furthermore, "[i]t is just as plausible that Congress, instead of deliberately ignoring the discriminatory animus underlying the 1929 criminalization of illegal entry or disingenuously papering over it, was aware of that history and nonetheless thought that retaining [section] 1326 and stiffening its penalties was consistent with the objectives" of the INA.  Calvillo-Diaz, 2022 WL 1607525, at *11; Salas-Silva, 2022 WL 2119098, at *4 (explaining "there is the necessary presumption of good faith in these amendments, especially in light of the fact that Congress has numerous legitimate motivations for enacting and preserving Section 1326").

        Therefore, even assuming Section 1326 has "had a disparate impact on Latinos since its inception" (Reply at 1), the Court finds that Defendant's evidentiary proffers, which focus largely on the context of immigration issues and attitudes in the larger time period, are insufficient to establish under the Arlington Heights standard that discriminatory animus toward Hispanic peoples was a motivating factor in the enactment of Section 1326.  The Court also concludes that the statute satisfies rational basis review because it is "rationally related to the legitimate government interests of preventing the reentry of those who have violated immigration laws in the past," and the Court thus upholds the statute against Defendant's constitutional challenge.  Hernandez-Lopez, 2022 WL 313774, at *7 (finding Section 1376 to be rationally related to legitimate government interest).  Because the Court has found that Defendant has failed to show the statute at issue violates the Equal Protection Clause under either relevant

standard, it need not consider the parties' arguments as to which standard should apply.  (Opp. at 2 n.1.)

Evidentiary Hearing Request

Defendant requests an evidentiary hearing on the issues of racist motivation in connection with the passage of Section 1326.  An evidentiary hearing "must be held 'only if the moving papers allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved.'"  Sanchez-Felix, 2021 WL 6125407, at *8 (citation omitted).  Defendant's evidentiary proffer as to Section 1326 relates largely to the historical context in which immigration legislation was enacted in the twentieth century and fails to establish any direct link between racial animus and the passage of Section 1326.  Because the factual allegations upon which Defendant relies are insufficient to show that the statute at issue is unconstitutional, the Court concludes such a hearing would be unnecessary.

Jurisdictional Challenge

Defendant also moves to dismiss the Indictment on the grounds that the Immigration Judge who ordered her removal lacked jurisdiction to do so because the NTA omitted the time, date, and place at which her removal hearing would be held.  (Mem. at 16.)  Defendant recognizes that this argument is precluded by binding decisions of the Second Circuit but wishes to preserve such argument in case the Circuit changes its position.

The Second Circuit has held "that a NTA missing the relevant date and time information regarding the initial hearing may be cured by a subsequent hearing notice which contains the required information."  Suquilanda, 2021 WL 4895956, at *2 (citing Banegas-Gomez v. Barr, 922 F.3d 101, 112 (2d Cir. 2019)).  Courts sitting in this District have also

extended this reasoning to the location of the initial hearing.  Id. at *3 (finding information with respect to place "may be cured" and that such approach is "fully consistent with the [applicable] regulatory language . . . as well as the reasoning of Banegas-Gomez"); United States v. Beltran, 21-CR-473-CM, 2022 WL 799638, at *6 (S.D.N.Y. Mar. 16, 2022) (finding Immigration Court "was vested with jurisdiction" because the NTA's omission of time, date, and location information were cured prior to the hearing).

Here, although the NTA did not include the information about the date, time, and location of the hearing, the subsequently-issued Notice of Hearing in Removal Proceedings cured such deficiencies.  Therefore, the Immigration Judge who ordered Ms. Santos-Reynoso's removal had jurisdiction, and the deportation order is valid.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the indictment is denied in its entirety.  The Court also denies Defendant's request for an evidentiary hearing.

Docket entry no. 29 is resolved.  The next pretrial conference in this case is scheduled for July 7, 2022, at 2:15 p.m.

SO ORDERED.

Dated: New York, New York  
      June 23, 2022

/s/ Laura Taylor Swain  
LAURA TAYLOR SWAIN  
Chief United States District Judge